# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# GREENVILLE DIVISION

| | |
|---|---|
| Schuyler Line Navigation Company, LLC, ) | |
| ) | C.A. No. 6:22-04195-HMH |
| Plaintiff, ) | |
| ) | **OPINION & ORDER** |
| vs. ) | |
| ) | |
| ) | |
| Fluor AMEC II, LLC, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' motions for partial summary judgment. After a review of the facts and pertinent law, the court denies Schuyler Line Navigation Company, LLC's ("Schuyler") motion and grants in part and denies in part Fluor AMEC II, LLC's ("Fluor") motion.

## I. BACKGROUND

This case arises out of a contract between Schuyler and Fluor for the provision of ocean transportation and shipping services to Ascension Island, a remote volcanic island in the South Atlantic Ocean ("the Contract"). Under the Contract, Schuyler agreed to transport nine shipments of aggregate and two shipments of sand from Florida and Canada to Ascension Island. (Fluor Mot. Partial Summ. J. Ex. 1 (Contract 5, 8), ECF No. 44-1); (Id. Ex. 3 (Nicely Dep. 3:14-4:14), ECF No. 44-3.) Fluor used the shipments of aggregate and sand to repair a military runway on the island pursuant to its prime contract with the United States Air Force ("USAF"). (Id. Ex. 1 (Contract 1), ECF No. 44-1.)

Two main issues are raised in the motions currently before the court: (1) whether Fluor breached the Contract by failing to pay Schuyler for demobilization work performed after

1

December 23, 2022, and (2) whether Schuyler is entitled to payment of certain charges resulting from delays in loading and unloading vessels. Fluor also moves for summary judgment on Schuyler's claims for breach of contract accompanied by a fraudulent act.

A.     **The Contract, Modification 12, and the Unpaid Demobilization Invoice**

The Contract, which originally contemplated a November 1, 2021, completion date, was modified several times by the parties. (Fluor Mot. Partial Summ. J. Ex. 1 (Contract 2), ECF No. 44-1.) The final Contract modification – Modification 12 – was executed on August 23, 2022. (Id. Ex. 2 (Modification 12 at 1), ECF No. 44-2.) Under Modification 12, the parties agreed, among other things, to reinstate Aggregate Shipment 9 to Schuyler's scope of work, increase the Contract price, and extend Schuyler's period of performance to December 20, 2022. (Id. Ex. 2 (Modification 12 at 3, 11, 12), ECF No. 44-2); (Schuyler Mot. Partial Summ. J. Ex. C (Swadley Dep. 8:13-9:23), ECF No. 45-5.) Modification 12 also revised the Contract's Schedule of Values, which lists certain scopes of work identified by Contract Line Item Numbers ("CLINs"). Relevant here, new monthly recurring costs for "[Schuyler] Labor (All)," "On-Island Subcontractor (Excl Tug Crews)," "[Schuyler] Infra Equipment (Rented/Leased)," "Tug Services / Barges & Jack-Up," "Land Occupancy Permit," and "Sure Internet" were added as CLINs 0147-0152. (Fluor Mot. Partial Summ. J. Ex. 2 (Modification 12 at 10), ECF No. 44-2.)

Also relevant to Schuyler's claim for unpaid demobilization services is Part II, Section 2.7, which provides:

> The lump sum prices for mobilization, demobilization, and contractor operating support shall be fixed and firm and shall not be subject to adjustment based upon any additions or deletions, irrespective of any change to the unit price portion of the Work, except at the express written order of [Fluor], and in that event, shall be adjusted in accordance with Commercial Schedule A -Schedule of Values. *Currently Demobilization is estimated to begin November 20, 2022 and is estimated*

2

> *to take 45 to 60 days. The contract will be modified for on Island personnel services and equipment for a phased-out basis until Demobilization is complete. The start of Demob may be adjusted pending the completion of discharge of Aggregate Shipment 9.*

(Id. Ex. 2 (Modification 12 at 15), ECF No. 44-2) (emphasis added).

On November 1, 2022, Schuyler submitted Invoice 178 for demobilization services to be performed during the month of November. (Schuyler Mot. Partial Summ. J. Ex. E (Invoice 178), ECF No. 45-7.) Fluor paid this invoice in full. (Id. Ex. F (Invoice 187 Rejection 4), ECF No. 45-8.)

A month later, on December 1, 2022, Schuyler submitted Invoice 187 for demobilization services to be performed under CLINs 0147-153 from December 1 to December 31. (Id. Ex. G (Invoice 187), ECF No. 45-9.) Fluor rejected Invoice 187 the next day. As a basis for the rejection, Fluor cited Note 7 to CLIN 0024, titled "Lighterage Tugs / barges - Demobilization." (Id. Ex. F (Invoice 187 Rejection 4), ECF No. 45-8.) Note 7 provides that "**CLIN** 0024 is invoiced on departure with completed demobilization checklist accepted by Fluor. Monthly extension compensation is payable for a period not to exceed 30 days after [the] last day of aggregate vessel discharge. Net 15 day payment terms." (Fluor Mot. Partial Summ. J. Ex. 2 (Modification 12 at 12), ECF No. 44-2.) In Fluor's view, because the "last day of aggregate vessel discharge" was November 23, 2022, and because the "previously paid [Invoice 178] covered the time period from [November 1] through [November 30]," Invoice 187 "should only be for 23 days in order to reach the full 30 days" of demobilization contemplated by Note 7. (Schuyler Mot. Partial Summ. J. Ex. F (Invoice 187 Rejection 4), ECF No. 45-8.) Fluor also instructed Schuyler that "the Period of Performance listed on [Invoice 187] should be [November 24] through [December 23]." (Id. Ex. F (Invoice 187 Rejection 4), ECF No. 45-8.)

3

In line with this request, Schuyler submitted a new invoice – Invoice 187R1 – on December 5 for demobilization services performed from December 1 to December 23. (Id. Ex. H (Invoice 187R1), ECF No. 45-10.) Fluor paid this invoice in full. (Id. Ex. C (Swadley Dep. 10:24-11:2), ECF No. 45-5.)

Two days later, Schuyler, citing Section 2.7's language that demobilization "is estimated to take 45 [to] 60 days" and that the "[C]ontract will be modified . . . for a phased-out basis until [d]emobilization is complete," sent Fluor a revised demobilization proposal for the period from December 24, 2022, to February 16, 2023. (Id. Ex. I (Schuyler Proposal 3, 9), ECF No. 45-11.) Schuyler explained that its proposed price "reflect[ed] the required additional days past December 23, 2022[,] that [were] invoiced under [Invoice 187R1]." (Schuyler Mot. Partial Summ. J. Ex. I (Schuyler Proposal 4), ECF No. 45-11.)

Fluor rejected Schuyler's proposal and countered with a proposed Contract modification that extended Schuyler's period of performance until February 16, 2023, but did not increase the Contract price. (Id. Ex. J (Proposed Modification 13 at 4), ECF No. 45-12.)

Schuyler declined to execute the proposed modification because it "[did] not account for additional costs and delays incurred by Schuyler as a direct result of Fluor's failures and breaches." (Id. Ex. K (Dec. 22, 2022, Email 2), ECF No. 45-13.) In Schuyler's view, Modification 12 "specifically addressed the fact that the [C]ontract would be modified to address costs for on island personnel services and equipment until demobilization is complete." (Id. Ex. K (Dec. 22, 2022, Email 2), ECF No. 45-13.)

On January 30, 2023, Schuyler submitted Invoice 194R1, requesting $1,663,328.35 for demobilization services performed under CLINs 0147-0152 from December 24, 2022, to

4

February 2, 2023.  (Id. Ex. L (Invoice 194R1), ECF No. 45-14.)  This invoice remains unpaid and forms the basis for the parties' dispute.

**B.**    **The Unpaid Detention and Demurrage Invoices**

Fluor also moves for summary judgment on Schuyler's six claims for detention and demurrage totaling $2,300,343.75.  (Fluor Mot. Partial Summ. J. 11-15, ECF No. 44); (Second Am. Comp. ¶¶ 26-65, ECF No. 39.)

The Contract defines "demurrage" as "a charge payable to the owner of a chartered ship in respect of failure to load or discharge the ship within the time agreed."[1]  (Fluor Mot. Partial Summ. J. Ex. 1 (Contract 51), ECF No. 44-1.)  Under Part II, Section 5.1.16, Fluor agreed to make "demurrage payments to [Schuyler] in the amount of $75,000 per day ($45,000.00 for vessel & $30,000.00 for lighterage equipment) in circumstances where detention of a ship [is] beyond the time specified by a charter party for loading and unloading or for sailing."  (Id. Ex. 1 (Contract 47), ECF No. 44-1.)  Relatedly, Note 2 to CLIN 0025, titled "Detention Rates," provides that

> **CLIN 0025a & 0025b** will be as needed.  The days for detention will be negotiated and all days will require supporting documentation as indicated by [Fluor].  These rates will account for daily charges to include delay time, office & crew cost, daily maintenance, daily steaming costs & fuel cost.  In accordance with CLIN 0025a, detention is payable on a per day, as needed basis with the unit rate breakdown of $45,000 for ship and $30,000 for lighterage for the time period from [August 28, 2020,] through [October 31, 2021].  In accordance with CLIN 0025b, detention is payable on a per day, as needed basis at a unit rate of $45,000 for the time period from [November 1, 2021,] through [September 12, 2022].

---

[1] According to the operative complaint, "[t]he related concept of detention refers to charges for using a ship or a shipper's equipment beyond the allotted time (called free time) outside of the terminal, regardless of whether the ship or equipment is loaded or empty."  (Second Am. Compl. ¶ 23, ECF No. 39.)

5

(Id. Ex. 2 (Modification 12 at 6, 11), ECF No. 44-2.)  Finally, Part I, Section 2.0 states that "[a]ll Work shall be performed in strict accordance with the following described specifications, drawings, and other documents, which by this reference are made a part hereof," and includes the "Project Schedule" as Exhibit One.  (Id. Ex. 1 (Contract 5), ECF No. 44-1.)

Citing Section 5.1.16, Fluor argues that it is liable for demurrage charges *only* when "detention of a vessel is beyond the time specified by a charter party for loading and unloading or sailing."  (Id. at 12, ECF No. 44.)  Thus, because "it is undisputed" that the parties "never set a time for loading, unloading, or sailing," Fluor contends that it is not obligated to pay Invoices 037, 047, 046, 120, 119, and 113.  (Fluor Mot. Partial Summ. J. 12, 13, ECF No. 44.)

In response, Schuyler submits that (1) Fluor improperly reads the word "only" into Section 5.1.16, ignoring Note 2 to CLIN 0025, (2) the parties' course of dealing reveals that Fluor previously made over $5 million in payments for detention and demurrage, and (3) the parties did, in fact, specify a time for loading, unloading, and sailing in the Project Schedule.  (Schuyler Resp. Opp'n 12-19, ECF No. 49.)

**C.      Procedural History**

Fluor and Schuyler filed their respective motions for partial summary judgment on August 23, 2023.  (Fluor Mot. Partial Summ. J., ECF No. 44); (Schuyler Mot. Partial Summ. J., ECF No. 45.)  Both parties filed their responses on September 6, 2023, (Schuyler Resp. Opp'n, ECF No. 49); (Fluor Resp. Opp'n, ECF No. 48), and replied on September 13, 2023, (Schuyler Reply, ECF No. 57); (Fluor Reply, ECF No. 58.)  These motions are ripe for decision.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."

6

Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  The court views "all facts and reasonable inferences in the light most favorable to the nonmoving party."  Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020).

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party does so, the burden shifts to the nonmoving party to "go beyond the pleadings" and come forward with "specific facts showing that there is a genuine issue for trial."  Id. at 324.  To withstand summary judgment, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."  Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013).

### III. Discussion

Under South Carolina law,[2] "[t]he cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." Schulmeyer v. State Farm Fire & Cas. Co., 579 S.E.2d 132, 134 (S.C. 2003).  To determine the parties' intent, the court "must first look at the language of the contract."  C.A.N. Enters., Inc. v. S.C. Health & Hum. Servs. Fin. Comm'n, 373 S.E.2d 584, 586 (S.C. 1988).  The contract "must be construed as a whole and different provisions dealing with the same subject matter are to be read together."  Skull Creek Club Ltd. P'ship v. Cook & Book, Inc., 437 S.E.2d 163, 165 (S.C. Ct. App. 1993).  "Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect."  McGill v. Moore, 672 S.E.2d 571, 574 (S.C. 2009).

---

[2] The parties agree that South Carolina law governs the Contract.

In such a case, "[t]he court's duty is to enforce the contract made by the parties regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully." Ellis v. Taylor, 449 S.E.2d 487, 488 (S.C. 1994).

With that said, even when faced with an ambiguous contract, the court's interpretation analysis is not necessarily complete. As a federal court sitting in diversity, the court applies "the federal summary judgment standard involving contract interpretation and ambiguity." Mears Grp., Inc. v. Kiawah Island Util., Inc., 372 F. Supp. 363, 371 (D.S.C. 2019); Southland Renda JV v. Xylem Water Sols., U.S.A., Inc., No. 2:21-cv-02550-DCN, 2023 WL 2613541, at *3 (D.S.C. Mar. 23, 2023) (unpublished). Thus, if the court finds the contract ambiguous in the first instance, it may "examine evidence extrinsic to the contract . . . included in the summary judgment materials, and, if that evidence is, as a matter of law, dispositive of the interpretive issue, grant summary judgment on that basis." World-Wide Rts. Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992). If, however, that examination "leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact." Id. In short, resolution on summary judgment is appropriate if the contract is unambiguous or if extrinsic evidence "definitively resolve[s]" any ambiguity. Wash. Metro Area Transit Auth. v. Potomac Inv. Props., Inc., 476 F.3d 231, 235 (4th Cir. 2007).

**A.    Whether Schuyler is Entitled to Nearly $1.7 Million for Demobilization Services Rendered After December 23, 2022**

Fluor argues that it is not contractually obligated to compensate Schuyler for demobilization work performed under CLINs 0147-0152 more than thirty days after the last day of aggregate discharge. (Fluor Mot. Partial Summ. J. 19, ECF No. 44.) Schuyler, on the hand, argues that Fluor agreed under Modification 12 to compensate Schuyler for demobilization

8

services rendered during the entire demobilization period.  (Schuyler's Mem. Supp. Mot. Partial Summ. J. 12-14, ECF No. 45-1.)  The court agrees with Fluor.

As a threshold matter, Note 7 unambiguously applies to CLINs 0147-0152.  Again, Note 7 appears after the phrase "Lighterage Tugs / barges - Demobilization" in the description to CLIN 0024.  (Fluor Mot. Partial Summ. J. Ex. 2 (Modification 12 at 6), ECF No. 44-2.)  The text of Note 7, which appears at the end of the Schedule of Values, provides: "**CLIN** 0024 is invoiced on departure with completed demobilization checklist accepted by Fluor.  Monthly extension compensation is payable for a period not to exceed 30 days after [the] last day of aggregate vessel discharge.  Net 15 day payment terms."  (Id. Ex. 2 (Modification 12 at 12), ECF No. 44-2.)  As is evident by Note 7's first sentence and the Schedule of Values, work performed under CLIN 0024 is invoiced as a lump sum upon completion of demobilization.  It follows that the second sentence referring to "[m]onthly extension compensation" cannot logically apply to CLIN 0024.  If the provision did not apply to some other CLIN(s), it would, in effect, be rendered meaningless.  To avoid that result, the term "[m]onthly extension compensation" must apply to CLINs 0147-0152 – the only monthly recurring CLINs related to demobilization.  See Yarborough v. Phoenix Mut. Life Ins. Co., 225 S.E.2d 344, 349 (S.C. 1976) ("That construction will be adopted which will give effect to the whole instrument and to each of its various parts and provisions, if it is reasonable to do so."); Boozer v. Loan & Exchange Bank, 58 S.E. 934 (S.C. 1907) ("The law favors a construction that will give effect to all the provisions of a contract."); Mordecai v. Seignious, 30 S.E. 717, 721 (S.C. 1898) ("In the interpretation of an instrument of writing, that construction is preferred which will give effect to all its provisions, rather than that which will render any of them ineffectual.").

9

Even if this language were ambiguous, the court would reach the same conclusion as a matter of law after considering the relevant extrinsic evidence. See World-Wide Rts. Ltd. P'ship, 955 F.2d at 245; Keystone Ne., Inc. v. Keyston Retaining Wall Sys., LLC, No. 6:12-cv-720–BHH, 2015 WL 1186398, at *11 (D.S.C. Mar. 16, 2015) (unpublished). Schuyler's CEO and Rule 30(b)(6) witness conceded that the term "[m]onthly extension compensation" in Note 7 specifically refers to CLINs 0147-0152:

> Q. And footnote 7, "CLIN 24 is invoiced on departure with completed demobilization checklist accepted by Fluor." Then it states, "Monthly extension compensation is payable for a period not to exceed 30 days after the last day of aggregate vessel discharge. Net 15 day payment terms." Do you see that?
>
> A. Yes.
>
> Q. Is that monthly extension compensation a reference to CLINs 147 and 152 with respect to the monthly recurring charges?
>
> A. I believe so.
>
> Q. So according to footnote 7 then, the monthly extension compensation, which would be CLINs 147 to 152, those would be capped at 30 days after the last date of aggregate vessel discharge, it would be aggregate number 9, right?
>
> A. That's what footnote 7 says, yes.

(Fluor Mot. Partial Summ. J. Ex. 3 (Nicely Dep. 34:21-35:13), ECF No. 44-3.)

Having found that Note 7 applies to CLINs 0147-0152, the resolution of the parties' cross-motions for summary judgment on the nonpayment of demobilization services is straightforward. Work performed under CLINs 0147-0152 "is payable for a period not to exceed 30 days after [the] last day of aggregate vessel discharge." Although Fluor has undisputedly paid the amounts sought by Schuyler through December 23, 2022, (Schuyler's Mem. Supp. Mot. Partial Summ. J. 6-7, ECF No. 45-1), the parties disagree on the "last day of aggregate vessel

discharge." Schuyler claims that the last day of aggregate discharge was November 26, 2022. (Fluor Mot. Partial Summ. J. Ex. 3 (Nicely Dep. 35:14-21), ECF No. 44-3.) If that were the case, then Schuyler would be entitled to payment for an additional three days of demobilization work performed on December 24, 25, and 26, 2022. On the other hand, if the last day of aggregate discharge was November 23, 2022 – as Fluor claims, (Schuyler Mot. Partial Summ. J. Ex. C (Swadley Dep. 18:24-19:2), ECF No. 45-5) – then Schuyler is not entitled to any additional sums for demobilization.

Schuyler resists this conclusion and contends that Section 2.7 controls over Note 7. Section 2.7 provides that "[d]emobilization is *estimated* to begin November 20, 2022[,] and is *estimated* to take 45 to 60 days" and that "[t]he [C]ontract *will be modified* for on Island personnel services and equipment for a phased-out basis until [d]emobilization is complete." (Fluor Mot. Partial Summ. J. Ex. 2 (Modification 12 at 15), ECF No. 44-2) (emphasis added). According to Schuyler, a plain reading of Section 2.7 reveals that Fluor agreed to compensate Schuyler for services rendered during the entire demobilization period. (Schuyler Resp. Opp'n 20-26), ECF No. 49.) The court is not convinced. First, the language estimating when demobilization might begin and how long it might take is too indefinite and uncertain to give rise to an enforceable obligation. Likewise, the provision providing that the Contract "will be modified" at some future point is a mere agreement to agree and, as such, is unenforceable. See N. Am. Rescue Prods. v. Richardson, 769 S.E.2d 237, 241 (S.C. 2015) ("Provisions which are essentially agreements to agree in the future have no legal effect."); Ellis, 449 S.E.2d at 489 ("A contract provision leaving material terms open for future agreement is void for indefiniteness."); Stevens & Wilkinson of S.C., Inc. v. City of Columbia, 762 S.E.2d 696, 701-03 (S.C. 2014) (finding a memorandum of understanding unenforceable because its "clear language . . .

11

indicate[d] the parties consciously agreed to finalize binding agreements at some point in the future").

Based on the above, the court finds that Schuyler is not entitled to payment for demobilization work performed under CLINs 0147-0152 more than thirty days after discharge of the last shipment of aggregate. There remains, however, a genuine dispute of material fact as to when Schuyler completed discharging that shipment. Accordingly, the parties' cross-motions for summary judgment on this claim are both denied.

**B.     Whether Schuyler is Entitled to Payment of the Six Detention and Demurrage Invoices**

The sole basis for Fluor's motion for summary judgment on Schuyler's claims for detention and demurrage is that the Contract does not specify a time for "loading, unloading, or sailing," as required by Section 5.1.16. (Fluor Mot. Partial Summ. J. 12-13, ECF No. 44.) Schuyler, however, has put forth evidence, in the form of the Project Schedule – a document explicitly referenced in the Contract – showing that the parties agreed to seventeen days for loading each aggregate shipment and sailing to Ascension Island and seventeen days for discharge. (Schuyler Resp. Opp'n 19, ECF No. 49); (Id. Ex. M (Sept. 25, 2021, Email 16-18), ECF No. 49-16.) For this reason alone, Fluor is not entitled to summary judgment on Schuyler's claims for unpaid detention and demurrage charges.[3]

---

[3] The court rejects Fluor's arguments (1) that Schuyler is bound by the testimony of its corporate representative stating that there was never an agreement between the parties specifying a time for loading, unloading, or sailing, and (2) that Schuyler's introduction of the Project Schedule is an impermissible eleventh-hour invocation. (Fluor Reply 7-8, ECF No. 58.) First, "the testimony of a Rule 30(b)(6) witness is merely an evidentiary admission, rather than a judicial admission." Vehicle Mrk. Research, Inc. v. Mitchell Int'l, Inc., 839 F.3d 1251, 1261 (10th Cir. 2016). As explained by one leading treatise,

> the testimony of a Rule 30(b)(6) deponent does not absolutely bind the corporation in the sense of a judicial admission, but rather is evidence that, like any other

Summary judgment is not warranted for an additional reason. Section 5.1.16 specifies that "[Fluor] will be liable for demurrage payments . . . in circumstances where detention of a ship [is] beyond the time specified by a charter party for loading and unloading or for sailing." (Fluor Mot. Partial Summ. J. Ex. 1 (Contract 47), ECF No. 44-1.) By Section 5.1.16's plain language, Fluor's obligation to make demurrage payments is predicated on the existence of "a charter party." Fluor seems to contend that the term "charter party" – which is undefined and appears nowhere else in the Contract – is synonymous with the Contract itself.[4] (Id. at 13, ECF No. 44.) Arguably, if the term is to have any independent meaning, it must refer to an agreement other than the Contract. In any event, because the relevant extrinsic evidence on this point is conflicting and does not "definitively resolve[]" the ambiguity, Wash. Metro. Area Transit Auth., 476 F.3d at 235; compare (Fluor Mot. Partial Summ. J. Ex. 3 (Nicely Dep. 9:5-18), ECF No. 44-

---

       deposition testimony, can be contradicted and used for impeachment purposes. The Rule 30(b)(6) testimony also is not binding against the organization in the sense that the testimony can be corrected, explained and supplemented, and the entity is not "irrevocably" bound to what the fairly prepared and candid designated deponent happens to remember during the testimony.

7 James Wm. Moore, et al., Moore's Federal Practice § 30.25[3] (3d ed. 2016); see also United States ex rel. Landis v. Tailwind Sports Corp., 292 F. Supp. 3d 211, 217 (D.D.C. 2017) ("[T]he broad principle that testimony of a Rule 30(b)(6) representative binds the designating entity has been expressly repudiated by every court of appeals to consider the issue."). Second, Fluor can hardly claim that it was "sandbagged" by the inclusion of the Project Schedule in Schuyler's response brief: the Project Schedule is Bates stamped "FLUOR_00142977," indicating that the document was produced in discovery.

[4] A "charter party" is commonly understood to mean "[a] contract by which a ship . . . is leased by the owner, [especially] to a merchant for the conveyance of goods on a predetermined voyage to one or more ports or for a specified period of time." Charterparty, Black's Law Dictionary (11th ed. 2019); Int'l Marine Towing, Inc. v. S. Leasing Partners, Ltd., 722 F.2d 126, 130 (5th Cir. 1983) ("The term 'charter party,' often shortened to 'charter,' refers to the document setting forth the terms of a contract when one person (the 'charterer') takes over the use of the whole ship belonging to another (the 'owner').").

3) with (Id. Ex. 5 (Apr. 12, 2022, Email), ECF No. 44-5), summary judgment is denied on this ground as well.

C.     **Whether Fluor is Entitled to Summary Judgment on Schuyler's Claims for Breach of Contract Accompanied by a Fraudulent Act**

To recover for breach of contract accompanied by a fraudulent act, "a plaintiff must establish (1) the contract was breached; (2) the breach was accomplished with a fraudulent intention; and (3) the breach was accompanied by a fraudulent act." Maro v. Lewis, 697 S.E.2d 684, 688 (S.C. Ct. App. 2010). "Fraudulent intent is normally proved by circumstances surrounding the breach." Floyd v. Country Squire Mobile Homes, Inc., 336 S.E.2d 502, 503-04 (S.C. Ct. App. 1985). "Fraudulent act" is broadly defined as "any act characterized by dishonesty in fact or unfair dealing." Conner v. City of Forest Acres, 560 S.E.2d 606, 612 (S.C. 2002). The asserted fraudulent act must be "separate and distinct from the act(s) constituting the breach" and cannot "merely restate the manner in which [the defendant] is alleged to have breached" the contract. Smith v. Canal Ins. Co., 269 S.E.2d 348, 350 (S.C. 1980). Finally, while the fraudulent act "may be prior to, contemporaneous with, or subsequent to the breach of contract," it "must be connected with the breach itself and cannot be too remote in either time or character." Floyd, 336 S.E.2d at 504.

As an initial matter, the court disagrees with Schuyler's assessment that it is premature for the court to consider Fluor's motion for summary judgment on these claims because discovery is still ongoing. (Schuyler Resp. Opp'n 34-35, ECF No. 49.) The discovery deadline passed nearly two months ago on August 8, 2023, the dispositive motions deadline passed on August 23, 2023, and this case is subject to being called for trial on or after November 6, 2023. (Am. Scheduling Order 2, ECF No. 27.) Although parties are free to conduct discovery by agreement past the discovery cut-off date, such discovery may not interfere with court-imposed

14

deadlines. (Id. 2, ECF No. 27) ("**The parties may, with the consent of all counsel, conduct discovery up to the time of trial, provided the deadlines in this order are not affected.**" (bold font in original)).

Further, to the extent Schuyler's objections could be construed as the "functional equivalent" of a Rule 56(d) affidavit,[5] Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244-45 (4th Cir. 2002), the court declines to postpone ruling on Fluor's motion. Schuyler had seven months to schedule the depositions that it claims are essential to its response and – apart from identifying the individuals it seeks to depose – has not "identif[ied] any specific information that would create a genuine dispute of material fact." See Hodgin v. UTC Fire & Security Americas Corp., Inc., 885 F.3d 243, 250-51 (4th Cir. 2018) (holding that the district court did not abuse its discretion by denying plaintiffs' Rule 56(d) motion where plaintiffs had three months to schedule additional depositions after a stay was lifted and offered only "generic statements [that] merely parrot[ed] the potential benefits of any deposition"). For these reasons, Fluor's motion is not premature and is properly before the court for consideration.[6]

Turning to the merits of Fluor's motion, the court first finds that Schuyler has failed to create a genuine issue of material fact about whether Fluor fraudulently breached Modification

---

[5] Federal Rule of Civil Procedure 56(d) provides that the court may deny or defer considering a motion for summary judgment if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d).

[6] The cases on which Schuyler relies are inapposite. For example, in one case, the defendant moved for summary judgment six months before the close of discovery and before a single deposition had been taken. Bankers Standard Ins. Co. v. Chalmers, No. 9:19-cv-0248-DCN, 2020 WL 1187365, at *1-2 (D.S.C. Mar. 12, 2020) (unpublished). In another, the defendant moved for summary judgment less than a month after the complaint had been filed and before any discovery had been exchanged. Mosher v. Washington Gas Light Co., 18 F. App'x 141, 142, 146 (4th Cir. 2001) (unpublished).

12.  To start, Schuyler has not put forth sufficient evidence that Fluor acted with fraudulent intent in refusing to pay for demobilization services rendered after December 23, 2023.  Schuyler cites the deposition testimony of Fluor's corporate representative in which he supposedly "admitted that Fluor never intended to pay Schuyler for the [d]emobilization [s]ervices beyond 30 days" as evidence of fraudulent intent.  (Schuyler Resp. Opp'n 28, ECF No. 49.)  The court, however, has already held as a matter of law that Fluor is not contractually obligated to pay for those services beyond the thirty-day period.  Schuyler also fails to identify an accompanying fraudulent act.  Although Schuyler contends that "Fluor threatened to seize Schuyler's equipment and have the last shipment of sand and aggregate be performed by another shipping company" to coerce Schuyler into entering into Modification 12, that act relates to the formation – and not the alleged breach – of the agreement.  (Id. 28, ECF No. 49); see Lilienthal v. S.C. Pub. Serv. Co., 177 S.E. 98, 99 (S.C. 1934); Branham v. Wilson Motor Co., 198 S.E. 417, 418 (S.C. 1938).

The court further finds that Fluor is entitled to summary judgment on Schuyler's claims for breach of contract accompanied by a fraudulent act related to the nonpayment of demurrage Invoices 047 and 113.  Schuyler submitted Invoice 047 on July 2, 2021, seeking $300,000 for one day of detention on May 14, 2021, an Ascension Island holiday, and for three days of detention on May 5, 6, and 7, 2021, after discharge priority was given to a USAF vessel.  (Second Am. Compl. ¶¶ 33-38, ECF No. 39.)  As fraudulent acts, Schuyler claims that Fluor, *prior to executing the Contract*, failed to disclose that the holiday was a nonworking day and falsely represented that the scheduling conflict between the discharge of Schuyler's aggregate shipment and the arrival of the USAF vessel would be resolved.  (Schuyler Resp. Opp'n 29-30, ECF No. 49.)  Notwithstanding Schuyler's arguments, these acts cannot support a claim for breach of contract accompanied by a fraudulent act because they relate to the making of the

Contract and not its alleged breach. Floyd, 336 S.E.2d at 504 (explaining that the fraudulent act "must be connected with the breach itself and cannot be too remote in either time or character"); Coker v. Norwich Com. Grp., Inc., No. 3:20-03071-MGL, 2022 WL 2276260, at *5-6 (D.S.C. June 23, 2022) (unpublished); Williams v. Intier Automotive Interiors of Am., Inc., No. 7:09-CV-01144-JMC, 2011 WL 588216, at *3 (D.S.C. Feb. 10, 2011) (unpublished).

Schuyler's final claim for breach of contract accompanied by a fraudulent act relates to Invoice 113. Invoice 113 requests $717,843.75 for nearly sixteen days' worth of demurrage resulting from port congestion at Aulds Cove, Nova Scotia. (Second Am. Compl. ¶¶ 60, 64, ECF No. 39.) On February 3, 2022, one of Schuyler's vessels, the MV SLNC Severn, arrived at Aulds Cove to load a shipment of aggregate. (Id. ¶ 61, ECF No. 39.) The Severn was not called into position to load, however, until February 19 and did not fully load until February 22. (Id. ¶ 63, ECF No. 39.) According to Schuyler, Fluor had known since February 1 that the aggregate supplier at Aulds Cove "was prioritizing the loading of three vessels over the Severn" and had offered to "displace the three vessels and give priority to the Severn if Fluor paid $650,000." (Schuyler Resp. Opp'n 31-32, ECF No. 49.) Schuyler asserts that Fluor acted fraudulently by (1) failing to disclose this information to Schuyler and (2) failing to negotiate Schuyler's position in the queue with the aggregate supplier. (Id. at 32, ECF No. 49.)

Even when viewed in the light most favorable to Schuyler, no reasonable jury could find that Fluor fraudulently breached the Contract based on these acts. While it is true that nondisclosure may, in certain circumstances, be fraudulent, Ardis v. Cox, 431 S.E.2d 267, 270 (S.C. Ct. App. 1993), Schuyler has offered no evidence to suggest that the parties were in a fiduciary or confidential relationship. Indeed, this case presents a complex business dispute between two sophisticated parties dealing at arm's length. Additionally, no reasonable jury

could find that Fluor engaged in unfair dealing by refusing to pay the aggregate supplier over half a million dollars for the Severn to "jump the line" at Aulds Cove. Finally, the fact that Fluor has paid Schuyler $405,000 toward Invoice 113 strongly cuts against any argument that Fluor acted with fraudulent intent. See, e.g., Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp., No. 01CIV8871 (JCF), 2002 WL 1144903, at *4 (S.D.N.Y. May 29, 2002) (unpublished) ("[T]he acknowledgment in the complaint that the defendants made a partial payment of the debt would seem to undermine any inference of fraudulent intent."); In re Shann, No. 22-12228-SAH, 2023 WL 2393959, at *4 n.3 (Bankr. W.D. Okla. Mar. 6, 2023) (unpublished) ("[I]t is well-established partial payments on a debt mitigate heavily against a finding of fraudulent intent with respect to non-payment.").

Based on the above, Schuyler has failed to raise a genuine issue of material fact on its claims for breach of contract accompanied by a fraudulent act related to the nonpayment of Invoices 194R1, 047, and 113. Fluor is therefore entitled to summary judgment on these claims.

### IV. Conclusion

For the reasons discussed above, the court **DENIES** the parties' cross-motions for summary judgment on Schuyler's claim for unpaid demobilization work performed after December 23, 2022, **DENIES** Fluor's motion for summary judgment as it relates to the nonpayment of Invoices 037, 047, 046, 120, 119, and 113, and **GRANTS** Fluor's motion for summary judgment on Schuyler's claims for breach of contract accompanied by a fraudulent act.

It is therefore

**ORDERED** that Fluor's motion for partial summary judgment, docket number 44, is granted in part and denied in part. It is further

**ORDERED** that Schuyler's motion for partial summary judgment, docket number 45, is denied.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
October 10, 2023